16-1329 et al. Sierra Club et al. Petitioners v. Federal Energy Regulatory Commission. Ms. Benson for Petitioner's Sierra Club et al. Mr. Waters for Petitioner's GBA Associates et al. Mr. Fulton for the Respondents. Ms. Marwell for the Intervenors. Good morning. May it please the Court, Elizabeth Benson on behalf of the Environmental Petitioners. I'm going to take 15 minutes to address the issues in our brief and then Mr. Waters will take 5 minutes to address the issues in Petitioner's GBA brief. I'd like to reserve 5 minutes for rebuttal. This case involves a 686 mile long pipeline that cuts across Alabama, Georgia, and Florida exposing communities to risks from pipeline ruptures, construction impacts, groundwater contamination, and air pollution and noise from compressor stations, just to name a few. The issues of this case involve FERC's arbitrary environmental justice analysis, its refusal to take a hard look at the greenhouse gas impacts from consumption of a billion cubic feet a day of gas, which FERC says will result from the project, and FERC's improper allowance of a 14% return on equity based on a hypothetical capital structure. All right, so in terms of the environmental justice community, in the analysis by the Commission, did it identify all of the burdensome facilities that were within the census track at issue here? Well, there are multiple census tracks at issue here. I thought we were really focusing on the place where Albany is. We are interested in Albany as well as the entire pipeline, but for Albany itself, there are many burdensome, the community is overburdened already. So my question is, in FERC's analysis, did it identify how the community was overburdened? No, Your Honor, FERC said that this is a majority white census track, and so therefore it's not in an environmental justice community, when in reality, they said it was looking at a mile radius around the compressor station. So petitioners showed that in fact the community around the compressor station is over 80% African American, as demonstrated by the census block data. That's right, so you have those two arguments as well. So I just want to be clear, is your understanding of what FERC said is because the census track is majority white, therefore it is not an environmental justice community? Correct. FERC said that because it's a majority white census track, the compressor station is more than a mile from the nearest environmental justice community. Didn't the EIS itself, though, recognize that the immediate vicinity surrounding the compressor station was 80% African American community? They may not have called the area an environmental justice community, but they recognized that, didn't they? No, Your Honor, in the comparison of alternatives, they have a table where they're comparing different compressor station locations, and they list the proposed location as not being an environmental justice community. That's not my question. My question is, and you can help me here, I'm not our expert. The question is whether they called it an environmental justice community, but whether they recognized that the area immediately surrounding the compressor was in a black neighborhood. I thought that the report itself acknowledged that. Your Honor, it did not acknowledge it for the mile radius around the compressor station. I'm not saying whether it acknowledged that it was an environmental justice community, but just the facts on the ground, what the demographics were. No, I do not think that they recognized that. They talked about some communities that were over a mile away, but they really relied on the fact that the mile radius, they said, was not an environmental justice community, so they didn't have to take a closer look at the impacts on that community. And that was directly contravening the evidence submitted by petitioners, and they didn't say that's wrong. They said, EPA says we can look at census tract data. In fact, the EPA guidance that they cited for that proposition warned against relying on census tract data repeatedly, specifically because it can miss pockets of high concentration pockets of minority communities or low-income communities. So the commission said that it wanted to rely on census tract data because then it would have uniformity in information along the pipeline. Well, Your Honor, I think uniformly along the pipeline doesn't mean that they shouldn't look at the facts on the ground for the one-mile radius around the compressor station. So what they did here is said, we're going to ignore this data, which is census block data, so it's just as acceptable, just as reliable as the census tract data. Who creates that? The census data? The census block. Is that a creation of the Census Bureau? Yes. If you go to the Census Bureau website, it shows census tract data and census block data. So that was not a creation of petitioners. That's the U.S. government. So that was a fundamental error because FERC couldn't assess the impact on a community that it refused to acknowledge exists. And while it does have some discretion and methodology, it does not have discretion to ignore the evidence in the record before it. FERC also found that 83.7% of the pipeline route affects environmental justice populations, but said that's not a disproportionate impact. It did that by comparing the percentage of environmental justice populations affected by the project, 83.7%, only to the percentage affected by a few other select alternatives. And as the EBA said in its comments, disproportionality needs to be considered in the context of whether impacts appreciably exceed those on the general population, not just on other alternatives that also primarily affect. I mean, doesn't common sense tell us that the best comparison is between proposed alternatives? I mean, we're trying to give to the public and to the decision maker a real decision. And you can have a pipeline going here or here or here. Why not compare the demographic groups between and among those pipelines? What's wrong with that? Your Honor, I think it's fine to do that, but there also has to be a comparison to a more general population to get some understanding of how impactful the pipeline is. And, again, the – as FERC said, the EPA supported its approach of only comparing to these alternatives that also highly impact these populations. But, again, the EPA guidance that FERC purported to rely on actually says that if you do take alternatives that are also only affecting areas that are predominantly environmental justice communities, you need to also look at an alternative that doesn't do that so you get a sense of the actual demographics and whether environmental justice communities are being disproportionately impacted. What, in your view, is the court supposed to do with this? In other words, what standard are we applying here? Because the guidance says it doesn't create any rights. It's for the benefit of the executive branch department just to help them look at this. So what does the court do with this? So, Your Honor, we are trying to enforce NEPA. This claim arises under NEPA and the EPA, not under the guidance of the executive order. So we'd like the court to look at whether FERC's analysis was arbitrary and depreciate. And we believe it was because it ignored the data on the ground regarding the actual composition of the population around the compressor station. Even though it said it was using a one-mile area of analysis, it completely ignored who actually lives in a one-mile area of analysis or one-mile radius around that station. And for the 83.7%, that was arbitrary and depreciate because they only compared it to alternatives that also primarily affect environmental justice populations. There were other alternatives they could have compared it to that affected a lower percentage of environmental justice populations. Well, it was a no-action alternative, but the other alternatives, I thought, FERC did address and explain why they wouldn't work. I mean, there wasn't a port. One was very expensive. So they did address other alternatives, but they didn't include that in their environmental justice analysis where they said 54 to 80% of those alternatives also impact environmental justice communities. That only included what they called the land-based major route alternatives. So it was really only a few other alternatives. And then they compounded that error by saying that 54% is similar to 83.7%. Those percentages are not similar. It's 30% for a 686-mile pipeline. That means more than 200 additional miles of pipe affecting environmental justice communities. That's from here to New York. And by FERC's own benchmark, 10% is meaningfully greater. So that was also arbitrary and capricious under the APA standard. So just back to Judge Brown's question. The argument is that because of the way FERC proceeded, it didn't have the information that was relevant to making a decision whether to issue the Certificates of Convenience and Necessity. In other words, intervening-based argument in our court, it said NEPA is not a substantive, it's just a procedural. So the commission says, well, you know, we did this mammoth study. And Judge Griffith's question suggested it mentioned the African-American community around the compressor station. And we would have to find, wouldn't we, that if we were to agree with some of your arguments, that those omissions were material to the decision FERC had to make? In other words, I'm just trying to understand, as I understood what Judge Brown was focusing on, even if you're right about some of these things, what difference does it make underneath us? So I'm just trying to think of what's the best articulation of, does the agency have the information it needs in order to make the decision? And obviously there's a judgment involved. So petitioners don't need to show that FERC would change its decision. We just need to show that they made an uninformed decision. And we believe that here they did. When an environmental justice community is identified, the agency is supposed to take certain steps to zero in on whether that community is disproportionately impacted. Here they didn't do that. So it did affect their consideration of alternatives, as I mentioned earlier. It affected mitigation measures. It affected their decision about whether the project as a whole, whether the public benefits outweigh the adverse, potential adverse impacts. And I see I only have three minutes left. So I'd like to turn briefly to downstream greenhouse gas impacts. The primary objective of this project is to supply natural gas to power plants. NEPA requires indirect effects to be analyzed. The consumption is not speculative. FERC said that this project would result in the consumption of a billion cubic feet a day. It had widely available tools available. EPA pointed it to a Department of Energy study that it could have used. And it's excused that some of the gas or some of the emissions will potentially be offset. It's not an adequate explanation for not analyzing those impacts, nor is the fact that it will be regulated downstream. If we disagreed with you and felt that there wasn't a sufficient link between the greenhouse gas emissions and specific climate change, if we disagreed with that, is there some reason then for them to do the calculations for methane emission? If you can't link it to specific climate change? Well, I think we're primarily talking about carbon dioxide from the power plants. Yeah, and they can calculate that, and they failed to do so. And why do that unless you can link it to a specific climate change? Because it gives the petitioners, the public, and FERC itself, more information about the impacts of this project. And I now have under two minutes left, so I think I'd like to... I'll give you some more time, but I just want to be clear. The agency itself, in its environmental analysis, makes the connection between greenhouse gases and climate change. So at least when it was making this determination, the agency had already accepted that, had it not? The agency accepts the idea that greenhouse gas impacts cause climate change, but they include no analysis of how this project, any meaningful assessment of the greenhouse gas impacts, the greenhouse gas emissions that will result. No, I understand, but I thought Judge Griffith's question was getting to the basic point. And what I was trying to respond in part was, the agency has already, for purposes of this order and rehearing order, accepted the link. And, of course, the agency can respond if that's incorrect, but I thought the agency had already accepted that there was a link, and it gave other reasons for not proceeding. It accepts the link between greenhouse gases and climate change, but doesn't assess them as to this project. As for the emissions from the power plants, FERC both provides a few excuses for failing to take a hard look, and that's the portions of the gas will be offset, and that downstream power plants are regulated, and those excuses do not hold water. But then it also says there's not a sufficient connection, and even if there was, we don't have the information available. Not a sufficient connection between what and what? The pipeline and the power plants, the power plant emissions. Well, isn't that right? One of the problems with trying to understand how this really works is that when FERC is looking at and trying to do a NEPA analysis, it's looking at what impact will building the pipeline actually have, right, that project, whereas who uses it later, that's not something they can control. I guess the question is, what is it that you think should be part of their analysis of the pipeline when it's really an effect that's going to be, if it happens, the result of how the end user uses that gas that goes through the pipeline? Well, because NEPA requires indirect effects that are reasonably foreseeable to be analyzed, and this is clearly a reasonably foreseeable effect of building this pipeline. That billion cubic feet a day of gas is not going to flow and not going to be burnt at power plants if FERC does not approve this pipeline. So it should be as a classic indirect effect considered before FERC decides whether the project is in the public interest. Why isn't this controlled by public citizen and in our cases interpreting public citizen? Well, public citizen had a pretty narrow holding that it's only if the agency has no control over the effects or the action itself such that the information in the EIS would hold no value. It would have no impact on the decision. Here, FERC makes an analysis of whether the project's public benefits outweigh the potential adverse impacts. So it can take into account that X number of greenhouse gases are going to be released in making that determination. And then the LNG cases that you referenced, they held that the Department of Energy is the entity that's turning, basically turning the spigot on or off here, letting that billion cubic feet a day per gas flow through Zorro. Here, there is no divided statutory authority like there is in the LNG context. FERC is the one making that decision to turn the spigot on or off. There's no intervening decision like there was in those LNG cases. Let me just ask you about the 14.5%. What's your response to FERC's argument? Well, our claim is pretty simple despite the complexity of the issues here. Initial rates have to be in the public interest. So FERC says it's recently approved 14.5%. So that's what it was doing here. Well, this court has held that their reliance on prior cases is not sufficient. FERC needs to provide a reason and substantial authority for doing so. So here, basically, FERC said, well, in the past, we've given new pipelines this 14% return on equity with up to a 50% debt structure. They said up to a 50% debt structure. That means it's the highest that they give. And when FERC undertakes this analysis, I'll quote the Pine Needle proceeding, which was the Section 7 case, in which a very similar language is used in this court's North Carolina utilities commission case. That to establish a rate of return on equity, FERC identifies a zone of reasonableness based on the range of returns experienced by comparable companies and then adjusts the return of the pipeline at issue within this zone to reflect the business and financial risks specific to that pipeline. So merely saying we've done this in the past with other pipelines, and so we're going to give this pipeline the highest. Did you make that argument in your briefs? I had a hard time finding that. I think the strong argument that there wasn't substantial evidence supporting this, that they just relied on what had been done in the past, but I couldn't find that argument in your briefs. Yeah, I think we argue that they can't just cite to prior authority, and that is because they need to provide substantial evidence. I believe we used those words, or at least that they need to have a well-reasoned decision. All right. Let us hear from the consolidated case, GBA. At police court, my name is Jonathan Waters, and I represent GBA Associates and Kay Gregory Isaacs, who are the appellants here. Just a little bit of background briefly. They are landowners down in south Georgia near Moultrie, Georgia. For the last four years, as this project has been working its way from surveying stages to now, they have been fighting this pipeline. To give you an idea of this pipeline, because pipelines are different sizes, this seal of the United States, the center circle of that seal, I would say is approximately 36 inches. That is the diameter of this pipeline that is running through south Georgia. Now, our chief argument is an argument discredited by FERC, and that is that we think that FERC violated the Sunshine Act when they permitted this pipeline in the manner in which they did it by notational voting. How do you distinguish our precedent? Okay. The central precedent that they use in y'all's cases in the D.C. Circuit is the Communications Systems Inc. versus Federal Communications Commission. I would say that is the seminal case. And even in their brief, FERC states that they have relied on that precedent for 35 years to support notational voting. Now, when that opinion was written, it's apparent from that opinion, because the Sunshine Act hadn't been around for very long, it even states that in the opinion, that they look to the legislative history of the passing of that legislation. Now, the Sunshine Act, as you know, was basically a result of Watergate. The Ford administration came in and basically said, we want to do some legislation that makes, as Judge Brandeis said, brings to life sunlight that's said to be the best disinfectant, and electric light the best policeman. Now, here's how that case is distinguished. In that opinion, they quote Congressman Waterflowers from Alabama, who offered the original language that this court, the D.C. Circuit, noted, that the amended subsection would not preclude agencies from disposing of non-controversial matters by written circulation. And that is our argument. And this is a controversial matter? Yes. For four years, we have fought this pipeline. I will tell you how controversial it is in the state of Georgia. Back in January, February of last year, legislation was being passed in the Georgia legislature, where basically what they do is they give approvals for different activities, and then this activity was for the pipeline company, Fable Trail, to go underneath the waterways in the state of Georgia. Okay? Overwhelmingly, legislation was not passed to prevent them from doing that. Now, that shows that the majority of legislators in the state of Georgia were trying to prevent this pipeline from being constructed, because if they didn't have permission to go under the waterways, they couldn't construct the pipeline. Now, political things happen. Fable Trail is a student of this. I'm sorry. Help me. I thought in our precedent that the Texas Railroad Commission case specifically disregarded that distinction you're making. It doesn't make that distinction between controversial and non-controversial. Did I read that wrong? I don't think so. I think in even the AMREP case that you all had more recently, where AMREP made the procedural argument that it asserted that the commission's use of the written statement of nothing in the case violated the Sunshine Act. It quotes back to communication system, but then it goes on to use one of the exceptions where the Sunshine Act doesn't apply. So it refers back to that commission, but then it goes further to say why in that case it didn't matter. So what we're basically asking this court to do, my clients are, is, I mean, basically, in our opinion, the Sunshine Act has been being killed for 35 years because they have leapfrogged on that decision that was passed that specifically contained this language about disposing of non-controversial matters. So it's our request of this court, because what's going on here is they're circumventing the meeting process. They have to put out, as you all are aware, a notice, a Sunshine Act meeting notice. Okay. My clients had intended to, we all believed that the meeting that would have occurred approximately the second or third week of February was when this matter was going to be taken up by FERC. My clients and many others in South Georgia were intending to come to Washington when that happened. It didn't happen that way, because on February 2nd, by notational voting, by basically the petition circulating around the office like a memo, and being checked off, that's how they conducted the business on this super-controversial issue. Let me just be clear. I'm sorry. Your clients were very much involved in this in terms of notice of the pipeline and opportunity to comment, et cetera. They were. So the February notice that you referred to, did that notice say? I apologize. Go ahead. There was no February notice. That's just when the notational, when it was granted, the order was issued. So that's what I want to understand your understanding of the Act. Is it your view that the Commission must give prior notice that on a certain day it will take a vote in public on these applications? On a controversial issue, we believe so, Your Honor. I see. That's our opinion. And that's the way the law, I think, was written, based on the legislative history. Any other circuits, would you? No, Your Honor. All right. But I think this is the seminal circuit on this issue in administrative law. And like I said, we were planning to come up there for that meeting, and then it didn't occur, and then we find out that it's been passed by notational procedure. So then you got an opportunity to file a petition for reconsideration. We did, Your Honor. And we raised that issue in our petition for re-hearing. And that's our argument. So the votes were public in terms of the commissioners being identified as to who voted for. After the fact, yes, Your Honor. After the fact. After the fact. And on reconsideration, I'm just trying to understand here. Yes. You didn't point out any fraud, conflicts of interest. No, we're not intending any fraud or collusion on the part of the commission. So this is just a formality? Well, it's a – here's the question. If you look at the press club speech of the commissioner from exactly one year before this was notationally passed, she basically – I mean, in that quotation, she basically says, you know, it's becoming inconvenient for us to conduct our business by people coming that are objecting to these pipelines. That defeats the whole purpose of the Sunshine Act. If the Sunshine Act's purpose is to – is entitling the public to the fullest practical information regarding the decision-making processes of the federal government, then excluding the public and purposely excluding them by saying, hey, I've done a lot of county work for counties in Georgia. I've done it for Twiggy County, Small County, 10,000 people. We have an agenda we published before this meeting. It's a big deal what's on that agenda. Because people come out if they want to argue about any little nominal thing. But in this case, you have a super-controversial pipeline, 600 miles long, 36 inches wide, coming through people's neighborhoods, that the potential for explosion is there. That's the type of case where they should be provided the opportunity. And I think that's what the Sunshine Act – All right. I think we have your argument. Thank you very much. Thank you. All right. Counsel for submission. Thank you. Thank you, Your Honors. Ross Fulton for the commission. Your Honors, after a careful, balanced, and thorough environmental review, the commission approved the project at issue because they found a public need for increased natural gas supplies in the southeast, enhanced competition of protection against supply disruptions, and the fact that much of the natural gas from the projects would be offsetting the burning of higher emissions coal. So what do you do about these environmental justice communities which are inconvenient to the purpose? The commission certainly did not find that they were inconvenient or a problem, Your Honor. As I said, the commission, in its discretion, decided to identify and assess the project's impact on environmental justice. But you heard the discussion with petitioners' counsel. So how do you respond? I think there was a couple of issues there. So I'll start with, for instance, the comparison to alternatives. The commission's finding here was that, again, going to the standard of the executive order, it's disproportionately high in adverse effects. The commission found that this project would not have high adverse effects on environmental justice communities because it would not meet the extent or intensity criteria. But what if it had moderate effect but everywhere it was routed it went through African-American communities? It's a hypothetical, I know, but how would you read the law then? So I think there's indication in the executive order itself at GA1359 that if the project doesn't have high adverse effects, it therefore cannot have disproportionately high adverse effects. Okay, so in my hypothetical, it has moderate effects everywhere it goes, but the only place it goes are through black neighborhoods or Latino neighborhoods. Is that not a problem? Yes or no? Is that a problem or not? I think the commission... Yes or no? Is that a problem or not? Not under the standard of disproportionately high adverse. Now, I think, if I may explain a little bit here, I think in that situation, what the executive order is seeking to do and what the commission did here is identifying a set. So if that situation was presented to the commission, I presume the commission would do similar to what it did here with Dougherty County, which was most of the route was put within existing right-of-ways to minimize impact on environmental justice communities. But in Dougherty, the commission found that doing so would actually put it near residential areas. So the route was actually changed from existing right-of-ways to minimize impacts on residential communities. As the commission talks about at 450 of the environmental impact study at J967, the compressor station originally was going to be in an environmental justice track, but based on collaboration between the pipeline and Sierra Club and others, the compressor station was actually moved out of the environmental justice track, which is now the situation that Sierra Club points to. But nonetheless, the commission did, in fact, study the effects of the compressor station and other aspects of the pipeline on Dougherty County and found that it would be within air and noise requirements and not have other impacts that would rise to a high adverse level. So what would you have to show in order to meet FERC standards? According to the commission, and I should note that the executive order and the EPA guidance provides discretion to the agency. There's no question about it, and the question is how do you meet your burden under the agency's standards? If you look at 3-217-837 of the record, the commission has a chart to have high adverse, particularly under the expanding intensity. There needs to be a substantial change to resource and have a region-wide impact. So if the community is suffering from asthma with 80% of its population, then it has to go up to 95%? I don't think that the commission puts a sort of quantification on it. Well, that's what I'm trying to understand. And how do you meet the burden? To show an impact where, as you point out, the commission prefers to run the new pipeline alongside the old pipeline. So the old pipelines are already, you know, an adverse impact. So now we put another pipeline there. I'm just trying to understand. I've never quite understood, despite all the words, what has to be shown once it's established that South Florida needs natural gas. Underneath it, Your Honor. Or at least it needs some alternative to fossil fuels. Not necessarily natural gas, but it's proposing natural gas. That's correct, Your Honor. And obviously the commission does not control those decisions. But underneath that. What decisions? That Florida has made in terms of what types of energy supplies it needs and where to site its utilities. Well, it could. Depending on other findings, it could deny the application. It could, Your Honor. The commission considered that in the new action and found that it would either not meet the purpose of the project or would have uncertain effects because the commission recognizes Florida wants to increase its natural gas supply. So there could be other things done that have comparable environmental impacts. But how about taking Judge Griffith's hypothetical and saying not moderate, but great effects. And the only place the pipeline goes is through the environmental justice community. And even though the EPA guidance suggests various things, the commission has decided in its discretion not to use the measurement that would be most direct. And here, the measurement was specifically proposed to the commission. So it couldn't say, well, we're not going to do it because no one's proposed anything to it. I'm sorry, could you repeat that, Your Honor? I guess I don't understand. I mean, you tell me they have discretion. Of course they have discretion. South Florida needs a new energy source and it wants natural gas. And so it's inconvenient that there are these environmental justice communities and the fact that they are suffering health impacts at high rates isn't enough. I mean, I just wonder, have we written a lot of words, or the executive branch has written a lot of words, but they have no real meaning. So I think a couple of points here, Your Honor. The commission, again, to start with, the commission undertook an extensive look at the environmental resources potentially affected by the project. The commission found, for example, on water quality, groundwater, socioeconomic status, air and noise, the commission found that this required mitigation, minimization, and avoidance techniques. Those would not rise to significant impacts underneath that. The commission then put that in the rubric of high and adverse, and the commission similarly found that those would not rise to the intensity or extent. Now, in terms of, as Your Honor recognized, this is an area the commission saw all the area alternatives all impacted a fair number of environmental justice communities, and the commission was sensitive to that. In fact, contrary to what Sierra Club said, the commission considered with the Gulf of Mexico route, for instance, the impact on environmental justice communities. So if you look, for example, it's 412J929. Did it consider no action alternatives? It did, Your Honor. In 4-3J920, the commission said that the no action would self-evidently impact less environmental resources, and that includes environmental justice communities. The commission with the Gulf route noted this route would affect nearly 300 miles less of environmental justice communities. So the commission's cognizant of the route's effects, but as with all alternatives, the commission has to balance those choices, and the commission found here, given A, that the impacts, and the commission's understanding would not rise to the level of high and adverse, and the fact that the Gulf of Mexico route would not only cost $2.2 billion more, but bring in a whole host of marine effects that would not have been present. Well, I guess the question is, if the commission had used the data track, the census track data, would that have provided it with information that might have caused the commission to decide to grant the applications, but to add additional conditions of mitigation? I don't believe so here, Your Honor, because with respect to the specific area of Dougherty that Sierra Club points to, as I noted, the commission recognized, although it wasn't an environmental justice track, the environmental impacts data nonetheless considered the effects in Dougherty County. It changed the route of the pipeline there so as to minimize the effects on residents, including environmental justice communities in that area, and it moved the compressor station. So the ultimate purpose of this executive order and the guidance is so that agencies are cognizant of the potential effects of a project on environmental justice communities, and ultimately here by using discretion to consider the issue and address it where necessary to try to minimize those impacts. That's why the commission reasonably concluded that it would not be With respect to greenhouse gas, Your Honor, the commission did, in fact, consider the downstream effects of the project. It found that it would lead to the distribution and consumption of about 1 million decatherms a day, and the commission also recognized that greenhouse gas emissions are the primary source of climate change, but the commission found that it would not meaningfully inform the commission's decision to try to go further and estimate the physical effects from power plants, not the pipeline, but from power plants, burning the natural gas delivered at issue. And why? Two reasons, I think, Your Honor. Based on this court's decision and earth reports, Okay, so that's totally different, and we know why, and you know why. So here FERC has complete authority, all right? It knows precisely where the pipeline is going. It knows how much is being transmitted daily. It knows that on the two major, I don't know, pipelines, the companies, that they have contracts, firm contracts, for 95% of the natural gas and 83%, I mean, very high percentages. So they know how it's going to be used. They know Florida, the commission in Florida has told them, and they have these contracts that are ready to roll, and it has complete authority. And EPA wrote it and said, FERC, why aren't you looking at these options for measuring these emissions? And in reconsideration, petitioners suggested some tools that were available. And FERC said, we're just not going to do anything. So I think that there's not quite the direct linkage between the pipeline and power plant there are. For instance, the project is building a central hub for trading in natural gas. In fact, there's uncertainty regarding how much gas the power plants that are proposing. In the record, it tells me, FERC has told me exactly how much is going to be transmitted daily, and it's told me that the contracts are already signed, right, for 95% or 83%, two contracts. Yep. It wouldn't have been hard to do, would it? I think it would not have been hard to do. With all that information readily available. It would not have been hard to do, but it would have been hard to do in a meaningfully informative way for this reason. The commission could have said X tons or X amount is going to these two proposed power plants. That will lead to the emission of X amount. But the problem is there is also a significant amount of that new gas is going to be offsetting coal. Oh, so there's a lot of carbon that's going to be emitted anyway. The offset is not 100%. It's not 100%. I acknowledge that. But if we assume that it's 0%, that would not lead to a meaningfully informative number. But they couldn't say 0% because they know it's not 100% set off. So they could measure the difference, right? The commission, in theory, could have provided with a wide range of caveats that we believe. What caveats? Well, if there would be a big difference if natural gas was 30%, 40%, 50%, 60% on and on, offsetting the use of coal. The other thing I should point out is that the Florida commission has told the commission, our fossil fuel plants are exhausted. The demand is growing. We need natural gas. So approve this pipeline. So not only does FERC know all that. I mean, what more did FERC have to know? All these other cases have been some excuse. We don't have the authority to make the final decision. We don't know what's going to happen to the gas that's flowing through this pipeline. All those uncertainties are gone here. I think your Honor's point regarding the role of Florida here is an independent intervening actor, such as in Sierra Club or Public Citizen. Public Citizen, the agency didn't have the authority. Are I here? The agency has the authority. The agency does, just like FERC did in Sierra Club. But we're there, and there was the Department of Energy, a federal agency. We don't have that issue here. We have a state agency, the Florida Public Citizen. Florida can't overrule. Well, Florida is asking the Commission to support these applications. It's not intervening as a cause. It's instructed the pipeline that's approving to obtain natural gas supplies and to burn natural gas. In the Federal Council, what I'm trying to understand is when would FERC ever have enough information and enough certainty to think that it was required to use these tools to measure carbon dioxide emissions? I should distinguish, Your Honor, that the claim brought by Sierra Club is not to the emissions. Sierra Club wants the Commission to go the further step and measure the physical effects on the environment. But first they have to measure. They have to measure emissions. They can't even get there. Correct. But Sierra Club didn't say just measure emissions. They said we want you to go the next step and measure physical effects on the environment, not even the- What do you think that meant? I think that meant using a tool such as the social cost of carbon. And why couldn't the Commission use that? Well, the Commission, as the Commission explained, it was upheld in Earth Reports. Totally different case. All right, the Department of Energy was in charge. Here, FERC is in charge. It's different in that sense, Your Honor, but the Commission there still provided a rationale for why the social- it believed the social cost of carbon tool. I thought-I thought-I shouldn't speak for Sierra Club, but I thought they asked for both. And I thought that was the question that I asked your opposing counsel and set up the question of what- if we disagree with you that there are specific-linked to specific climate change events, is there still a reason for FERC to do the calculation and tell the world what-with the caveats that you identified, what the emissions will be? I think- And you're saying no. Yes, Your Honor, because- And why? Because the Commission- And let's say that I agree with you that you can't make the link between specific climate events. Let's say I agree with you on that. Isn't there still a reason to do the calculation and let the public know, let the decision makers know, what the emissions effect of greenhouse gases will be? The Commission did not believe there was because they did not believe there was a standard methodology. The Commission thought that-the Commission's baseline determination- That's what they said in Earth's report. But since then, the Department of Energy's report has come out. And that's what was twice referred to the Commission by EPA, saying, look at this report. Read this report. This tells you how to go about the measurements. And FERC didn't do it. The draft guidance, which is what was before the Commission at the time, provides discretion to agencies to make reasonable determinations as to what is-would meaningfully inform the decision. And the Commission here's baseline determination was that this project would not substantially contribute to greenhouse gas. But it didn't know. It did, Your Honor. It took an qualitative basis. It determined- It said, well, Florida won't be burning coal anymore. All right. End of discussion. In addition to the fact that for the two plants that the Commission knew about, yes, the Citrus and Okeechobee, those plants are going to be replacing coal. As the DOE study cited, Your Honor, said that cuts emissions in over half. And there's 50% less. And for any future plants that may be using the project, those are going to be subject to federal and state permitting to meet certain emission standards. So FERC just doesn't have to do its duty because it thinks somebody else will. Not quite, Your Honor. The Commission, at this point in time, just doesn't know what these future plants would look like in terms of what their-how they would actually use the gas, let alone what they would be. It would just be speculative. And that's in a signed contract, 95%. This is referring to the actual plant that FDLRD would choose to build, not just the fact that they've agreed to accept the natural gas. Again, NEPA is not going to the outcomes. It's just trying to meanfully inform here. And here the Commission believes that because it's natural gas replacing coal, it is- Because it's going to be 50% better. We don't need to worry about the residual 50%. I think the Commission is worried about it. I think that's why the Commission is looking for an extensive review of the type of consumption and distribution that the project will cause and the effects of global warming in the region. It just isn't taking the further step. Can I ask a question about the capital structure issue? Is it your position that you can justify a particular capital structure on the grounds that it was already approved elsewhere? It's already been used before? The Commission's position is that it's a-there's-the Commission has established a policy for the 14% with at least 50% debt. And that's basically based on two things. Ultimately, this is a market-based decision. But the Commission is looking at past new pipelines and asking itself what have investors required to get a sufficient rate of return in those cases, but at the same time keeping a reasonable rate for customers. And the Commission in previous-is building upon its past precedents. So in previous cases- So what I hear you saying then is that in a particular case in front of it, it doesn't have to justify that rate structure based on the circumstances presented before it. So for new-for new Greenfield pipelines, the Commission has a general policy and has determined it doesn't-for that particular pipeline, it doesn't necessarily need to get into the particular- Yeah, how much is the authority for that? Because I thought-I thought each case was supposed to be taken on its own. Well, that's-that's the reason the Commission has established a policy. So, for example, in Constitution, which is 149 for 61999, the Commission notes its new pipeline policy is based upon the regulatory contractual construction risk the new pipelines face, namely the uncertainty with obtaining approval. Well, in any regard to the particular case in front of it, the unique circumstances of this particular pipeline, you don't have to-your first position is we don't have to look at that. I don't think that's the position. I think the position is as a- That's what happened here, right? Well, I think-I think the baseline, Your Honor, is the Commission's sort of default, is that the policy applies. Now, if there were particular facts brought to their attention, then they may deviate from the policy or come to an alternative here, but- No, it's a burden. It's a rebuttable presumption. Everybody gets 14.5%. That is essentially how I read it, Your Honor. And that is, again, that's just at the initial Section 7 stage, and that's subject to review for adjusting reasonable rates. So at this point, we don't have a lot of evidence, since it's a new pipeline, without any sort of actual capital returns or it's not even-you know, the gas is not flowing. So once that is happening, the Commission obtains a lot more information and evidence about what would actually be necessary for this particular case. Yes, and so that's why it works on a baseline assumption. So somebody has to file a complaint or the Commission has to act? So the Commission has to respond to the act within three years, but in that time, anyone can file a complaint. Right. So I'm a rate payer, and for three years I've been paying these rates based on this 14.5% ROE, and then another two years will pass, another three years by the time the appeals are resolved. And, of course, you know, full retroactive refund process. That's the way it works. So, you know, I'm a corporation, and I set up another corporation that's going to be the owner of this pipeline. Everything's new because I know I'm going to get 14.5%. Is that the way you read the cases? I read the cases as having established that a 14% return with at least 50% debt is, at least as a sort of beginning step, the Commission has determined through its adjudication of numerous pipelines that this creates a reasonable rate of return to attract new investors to a new pipeline, but at the same time- So we don't care really anything about the parent company? The Commission, yes. The Commission has determined that it can use a hypothetical capital structure here because the parent of an existing entity isn't necessarily, it's not an apples-to-apples comparison to a new pipeline. The Commission could- Okay, it would be impossible to rebut the 14%, would it? I mean, what could you rebut it with? I think, for instance, you could- So to my point about what was said in the Constitution case, if you introduce evidence that something about the, for instance, contractual or construction risks that are with a general pipeline in a specific case, perhaps those don't exist for any number of reasons, large locked-in contracts, construction is easier for whatever reason. I think that- But I guess my ultimate point would be before the Commission here, that argument was never raised, and it's not raised under appeal either that the Commission lacks substantial evidence. There's complaints about how the Commission followed its policy here, but there's not complaints about that the Commission's determination was not supported by substantial evidence or that the Commission should have- No, but it didn't give a reasoned basis. It said we've done it before. Well, the Commission said that while citing an extensive amount, and the Commission didn't just approve it here, I should note. The Commission, in fact, reduced the proposal by Stable Trail to lower rates for consumers. Anything further, counsel? Only, I guess, with respect to notational voting here, the Commission gave an extensive opportunity for parties to participate. It held dozens of public hearings. It gave notice to interested parties, and this, in fact, GBA, as an active participant, had the route, in fact, altered in response to a concern. Do you agree with their reading of our precedent? I do not, Your Honor, no. I read Texas Railroad Commission as stating that notational voting is accessible under the Sunshine Act, and there's no distinction between, quote-unquote, controversial and non-controversial cases, but it's instead an accessible policy. All right, thank you. Thank you, Your Honor. Counsel for interveners? May it please the Court, Jeremy Marwell for the respondent interveners. I could start with the greenhouse gas issues and focus on the question of causation. I think that the causal arrow here runs the opposite direction. The cause of these power plants and emissions associated with that is economic and population growth in Florida, decision by the Florida Public Service Commission to choose a certain kind of fuel-to-fuel power plant, and decisions by the relevant federal and state agencies about how those power plants will be built and operated. And if you look at JA 910 to 911, it discusses the Duke Citrus plant and talks about the authorization from the Public Service Commission and the other federal agencies, not the Commission, that have authority over the licensing and operation of the power plant. So EPA was just wrong when it told FERC to go ahead and measure this commission. Well, I think it's important to differentiate between EPA's comments on the draft environmental impact statement. But it came back a second time. They did, but they also acknowledged that the Commission took into account the EPA comments, and that, I would submit, is all that NEPA requires. NEPA doesn't require the Commission to comply with everything that EPA asks for. Of course not. But the question is, why didn't it do it? It can point to 5,000 other causes. It's raining, it's hot in Florida, things like that. But the question here is, you've got these pipelines that South Florida wants. You've got contracts lined up for nearly all the capacities. FERC has full authority as to whether or not to grant or deny these applications. And all of that was true in IRF reports. FERC has authority to grant or deny the export facility. But we held that DOE was the final decision maker on authorizing imports and exports. So that FERC didn't have the authority. And I would respectfully submit the same is true here. FERC has no authority over the power plants. And Florida Power and Light and Duke. It can shut down the pipeline. Well, it could deny the certificate, I suppose. Suppose. That's what's before the commission. The application for the certificates of convenience and necessity. FERC could deny them. As FERC could have done in IRF reports. It could have denied authorization to build the physical facilities required. You're going to rely on IRF reports. You know what I'm going to say about reliance on that case. All I'm saying is, FERC is not in the same situation. It needs to be another federal agency. Well, J.A. 910-911 talks about the other federal agencies. EPA, the Fish and Wildlife Service, the Army Corps, that have permitting authority over the power plant. And so I would submit that if your concern is other federal agencies being involved, and I won't push the point too hard, but I don't take IRF reports with a causation analysis to depend on the identity of the other actor to say that it has to always be. You'd be saying, in this case, it was Florida. Florida was the DOE. That's right. And frankly, Florida Power and Light and Duke are going to keep the lights on whether or not this pipeline gets built. And you see in the alternatives analysis that FERC did in environmental assessment that there are alternatives. Why would it do that? I'm sorry. Why would it? You said regardless of whether FERC approves these applications or not, Duke is going to keep the lights on in Florida. Because it is a utility charged with doing so, with serving its customers. Well, under the relevant state laws that govern utilities. I mean, this is why I think this is in some ways the tail wagging the dog. But counsel, that's what we've heard about every argument here, as to where somebody has tried to identify a responsibility that FERC has, and FERC has a major role to play. It can't be denied. If FERC was unimportant, you wouldn't have thought it's approvable in these applications. That is true. I guess if you're not satisfied with the causation analysis, I would just point out, I think the obligation under NEPA is to analyze the effects, the impacts on the environment. And so there is an obligation to get the information that it needs and the public needs, right? So it can make, so the agency involved can make an informed decision, right? And I would submit that's what the commission did here. In its reports, this court upheld the proposition that there was no generally accepted methodology to connect marginal emissions with specific climate impacts. But we're talking not marginal here. And we're talking after the DOE report of 2014 is available. And EPA has pointed this out not once but twice to FERC. And the petitioners and their petition for reconsideration pointed out these tools. And so this is not a case where they don't know if there are tools available. And I thought Judge Griffith's question was right on. I mean, it's difficult to do. So FERC did cite the life cycle analysis. And it cited the key quantitative conclusion from that life cycle analysis as JA917. So it's not like FERC ignored that. The question was, is it within the deferential standard review and the substantial leeway the agency has in choosing the methodology about how to consider these effects, was FERC arbitrary and capricious? I don't understand the resistance to this. Again, would it create some horrible precedent if you were to say to FERC, you've got all this information together, now just do the calculations and let the public know what the greenhouse gas emissions will be from the plant when it's up and running. With all the caveats. We understand. We're forecasting. Speculation can play a role in the forecasting. It can't be too wild. But what's the game? There must be something that I'm not understanding that maybe you can help me understand. Because there's such resistance to this on something that seems fairly easy to do. So what am I missing? Well, if I could respond in two ways. One is I don't think it's as easy as everyone suggests. And two, you have a point. What I'm saying is you're saying it's difficult for them to estimate what the greenhouse gas emissions will be from the operable plant? Well, I would suggest that… Burning the natural gas? I think the relevant question is… Coming out of a smokestack. I think the relevant question is what are the emissions caused by and reasonably foreseeable result of the action the commission is taking, which is approving the pipeline and its associated facilities. I'm asking something far more modest. Here's the plant. There's the smoke. What are the emissions? And it seems to me that's an indirect effect of granting the license. And it's not hard to figure out or let people know that there's resistance to it. Well, so one, I think those are the kinds of determinations that the air permit and the agencies that have responsibility for licensing the plant would do. I think with respect to authorizing the pipeline, there is a somewhat reductionist view of what the purpose of this project is. The purpose is not just to provide gas to serve these power plants. This is a project that provides access to a more diverse array of gas, and it provides protection against supply disruptions, and it creates a new central Florida hub, which allows additional trade. Bottom line, more gas for southern Florida. That's what this pipeline is all about. That's correct, because there is a decision made by other agencies, and the Florida Public Service Commissions do that. I think I'm not aware of a decision of this court that requires an agency to quantify a particular emission for its own sake. And the question is, what are the impacts? And I think it would be a divergence from IRF reports to say that FERC was required to try to make that causal connection here. On the question, Jeff Griffiths, of why resist, I mean, we have multiple hundred pages environmental impact statement. We have a process that's been going on in front of the commission for years and years with extensive engagement with relevant communities, and there is a concern to those who have to finance and develop projects that if NEPA becomes sort of a fly-specking exercise, there is always something you can find. It's not fly-specking, counsel. Fifty percent for counsel with knowledge. All right? Anyway, tell us about the 14.5 percent. So I think the key point is that what FERC is trying to do is have a policy that looks to the relevant market to provide a return on equity or to use a return on equity in the calculation of relevant rate that provides a sufficient return to investors. And at paragraph 117 of the certificate order, FERC specifically noted that this was a greenfield pipeline and the precedence it cited, and I think you can fairly say incorporated by reference, I would view that as the relevant feature of this project. And there are many risks associated with financing and developing a pipeline as we see here today. And so I think this is not a question of the commission sort of blindly pointing to the old precedence, incorporating the key rationale. And there is a benefit in providing this stability and predictability with respect to a market-based approach. So I can understand how your client could come to FERC and say, look, this is so risky. There are all kinds of problems with the economy. I need a 20 percent return on equity. I get that. I don't understand how you ever get below 14 percent under your analysis. Well, the commission's policy, if I understand it, is 14 percent with 50-50 debt and equity. And debt is generally understood to be less expensive for rate payers, in part because the interest on debt payments is deductible. So FERC's policy, and there are cases cited that involve a higher debt ratio, which I think could result in a lower net return on equity since it's a multi-factor. You're part equity, part debt. So do you read our precedent as endorsing this type of approach? I guess a few things. One, this is an arbitrary and capricious standard of review, so the commission has some leeway in this very, very technical area of setting rates. Arbitrary and capricious or contrary to law? I guess that's correct. I'm not sure what both. The law is what does our precedent require. So I take North Carolina to be the key case from this court, and that case involved an existing pipeline, not a new pipeline, and specifically I think carved out the approach that the commission took in this case. So I think it's a fair application of North Carolina. So there it had a lot of data. All right. Here it has none. I'm just trying to contrast. So it can make a determination where it has a lot of data. And so it says, even though we don't have any data, you get the thing. Well, you have the data. But the reason you don't have data is that North Carolina was a case involving an operating pipeline, and these are cost-based rates. We don't have any of that because the pipeline has an entrance service. That's why I didn't think North Carolina is particularly helpful. Right. Well, I guess it's helpful. Is there a need for substantial evidence, though, to support the determination here? And if so, where is the substantial evidence? So, I mean, obviously the relevant certificate applicants provided in their application requested a certain return on equity. I think – I'm not sure there's a substantial evidence claim properly before this court, but that's your – I won't push it further than that. I think the real – Well, then push that. Why don't you think you should? I don't read the opening brief as raising that specifically. In the client brief. Right. Because you typically don't consider claims raised for the first time on this slide. But I guess I would submit that in a new pipeline case where you do not have any cost-based data, the relevant fact or evidence is that it is a new greenfield pipeline. And so the commission can rely on that key fact and rely on its precedent in this court on the discretion that is, at least until now, been available to it under this court's case. So when it identifies it as a greenfield pipeline, what is it telling us? I mean, it's telling you that it's a new pipeline that doesn't exist. And so there's a certain lengthy process, as you now can see, involved in getting from application, we'd like to build this, to the pipeline actually enters service so that revenue starts coming back from the shippers who assign the contracts for the pipeline. I know, but you understand what I'm getting at. Okay. So where does that take me? I guess it takes you to the market, which is what have investors required in other projects that involve. I mean, there are certain similarities when you're building a linear infrastructure project like this. So you look at what the return has been on these operating pipelines? No. So in this case, FERC cited other FERC precedents that involved greenfield pipelines and what the return was needed in those cases. The Constitution is a case that Mr. Fulton cited. Does it matter at all what the status of the economy is? I think that is built into citing recent decisions by commissions. 2008 was a very different year. That's all I'm trying to understand. No, I think the answer is it's built into what – I mean, the best evidence is what other investors have required. I mean, this is not buying one share of G.E. stock. I mean, these are risky investments, more so than – Nice return. Well, I mean, I think it's important to remember that this is a consistent commission policy. There's usually a virtue in taking a consistent approach. So when we say what other investors have required, we're talking about what the lending institutions charge? Well, I guess lending would be the debt component of the return on equity. Tell me what we're talking about. Well, we're talking about other investors who take an equity interest in a new pipeline. Like who? Like risks that are associated. It's not Ma and Pa Jones buying a couple of shares of Duke Energy. Who is it? I mean, the owners of this project include Duke and Florida Power & Light and other companies. That's correct. But these are billion-dollar projects. That's my point. So it's not an incestuous situation, but clearly if the three of us are pipeline companies, we're looking out for each other. Well, these are – That's all I'm trying to understand what's going on here. I mean, you say what other investors have required. Correct. Well, the Griffin plant requires no less than 16 percent. Brown's plant requires no less than 16 percent. So I want 16 percent. I mean, isn't that what's going on here? I think what's going on is the commission is charged with making these determinations. That doesn't give us much to go on, does it? Well, I – Fifty percent, 14. Barley. If I could make two quick points about the environmental justice component. First, I think it's important to remember this is a NEPA claim. They are not raising a claim under the executive order or the guidance. And Judge Griffith, your question, what if there were moderate effects all along the pipeline route? I don't believe that would be a violation of NEPA. So long as the agency acknowledged those effects and disclosed them in its NEPA analysis. I mean, it is true with respect to environmental effects. An agency can choose the most environmentally impactful route as long as it has considered all the effects. The commission looked in great detail at the effects on the communities within a one-mile radius of the Albany Compressor Station. And you can see that at a JA – well, you can see it at – There's a couple of maps. In a couple of places. There's maps in the environmental impact statement. And they specifically look this number of feet to this particular mobile home park, this number of miles to this church. And they acknowledge at JA 837 a relatively high degree of minority and low-income communities cross or within one mile of the route or compressor station. And the commission walked through every possible impact at those distances. So put aside anything about census tracts or census blocks. This is actual physical distance from the compressor station. And it looked at air emissions, including the higher incidence of asthma on African American communities, and said that there would be no significant effects and no violations of any of the relevant air quality standards. What do you mean significant effects? Well, there are regulations. The CEQ regulations provide a sort of a laundry list of significant factors. About 85% of the community is suffering from asthma because of these other illegal causes. Well, so the commission did a few things. One was it acknowledged that the relevant ambient air quality standards, by law, are required to be protective of human health and welfare with a margin for safety. So this is a statutory requirement. And it found that none of those, it went to see the charts from the EIS. This is the amount of- So if you need that, you're okay. I think there was also air modeling that FERC undertook. And I think there is a distinction between some of the cases which say an agency can't just say, but somebody else is dealing with that. And an agency says, look, these are standards- Well, you heard what FERC said earlier. At any rate, yes. I think there's a distinction. I don't think you have to worry about that risk here. The other thing, on the 83%, the Sheriff Club relies heavily on that statistic. I think some context is important here. First, the environmental justice analysis is not a one-factor test, and you have to work through it. Second, there are some socioeconomic realities associated with the pipeline going from rural Alabama down to rural Georgia. And you can see the statistics at R1925, that's the document number in the certified index of the record, D500 to D507, goes through each state, county, and census tract that the pipeline goes through. And remember, environmental justice effects are not just on minority communities, but also based on income. And any divergence from the state median income can qualify as an environmental justice community. And as the commission said, this is a process that took extensive account of environmental justice effects in Albany. They moved the compressor station out from where it would have been if the pipeline had been co-located. The commission then undertook an additional six alternatives, each one to the already backup location. Each one, they analyzed the potential environmental justice impact. And the percentages were less. Well, they vary. Some of the alternative locations were in the environmental justice tract. But the impact was less. I mean, 83% in this tract. Well, I think it's important. Those are FERC's numbers, not mine. Yes, but what are the numbers? So 83% of the pipeline location in Georgia overall, I think, affected environmental justice communities. But that number is 30% in Doherty County. They moved it specifically for this reason, to take account. And, again, even if you thought this was a claim under the executive order, all the executive order requires is that an agency take account as appropriate. So I think there was an extensive, actual physically taking account and attempting to address these effects on potential environmental justice communities. If there are no further questions. Thank you. Counsel for Petitioner, Sierra Cohn. Your Honors, I would just like to make a few points on rebuttal. Well, that is correct. This is a NEPA claim. And we're looking at whether it was arbitrary and capricious. And it is for the reasons that we've stated regarding the compressor station, refusing to acknowledge that that community exists, saying that 83.7% is not a disproportionate number, even though it's greater than all of the other alternatives, even though only a select few alternatives were chosen. And that number, that percentage comparison did not include the Gulf of Mexico alternative or the no action alternative. This whole high and adverse rubric created by FERC, it is very confusing because it's not in the guidance, which we are not trying to enforce, but they did say that they're purporting to follow it. The test is whether adverse impacts, whether there are disproportionately high and adverse impacts. The whole purpose of the environmental justice analysis is to determine if minority or low income communities are being disproportionately impacted. The EPA guidance specifically says this does not mean a significant impact. It means are they particularly disproportionately or particularly severely impacted. Here they clearly are and FERC refuses to acknowledge that. As to greenhouse gas emissions, FERC has shown that they do have a lot of information regarding the power plants this is going to, the size of those power plants, et cetera, and there's no reason to not engage in reasonable forecasting. The tools are available for them to calculate the greenhouse gas emissions. And finally, with the return on equity, this isn't a policy. They're just saying we've done this before, gotten away with it. The Mark West opinion actually cites in the footnote where they discussed this rate two other cases where they've done 70% debt, 30% equity ratio, which makes a big difference for rates, and they don't explain why that's okay. So we would ask the court to vacate the certificate order and rename it FERC. Thank you. Thank you. All right. Counsel? Petitioner, do you want a minute? I'll review it. If the standard, the standard here is to know that. But if the Sunshine Act, if the government agencies here like FERC, they would never have to have a meeting. If the Sunshine Act didn't require them to, what I'm saying is you could conduct all your business in a federal agency through notational voting, and there's nothing anybody could do about it, unless the legislative intent was that if there were controversial matters, that they would be brought forward and have a meeting about. And that's the absurdity of the reverse is I think what is the key point in our argument, Your Honor, because you'd never have to have a meeting. And you could just do everything past these memos around, and business would be conducted in that matter. And you'd say, well, we did a lot of public meetings earlier on these things, and FERC administered those. But that's the central crux of our argument. You would never have to have a meeting. All right. Thank you. Thank you all very much. We'll take the case under advisement.
judges: Rogers, Brown, Griffith